IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

_____x
                                :
UNITED STATES OF AMERICA,       : Criminal Action
                                :
              Plaintiff,         : No. 2:18-cr-00186
                                :
v.                              :
                                :
CONNOR ANTHONY PUTILLION,        :
                                :
              Defendant.         :
_____x


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE JOSEPH R. GOODWIN
UNITED STATES DISTRICT COURT JUDGE
IN CHARLESTON, WEST VIRGINIA
May 22, 2019


APPEARANCES:

For the Government:         Jennifer Rada Herrald, Esq.
                           Assistant United States Attorney
                           United States Attorney's Office
                           P.O. Box 1713
                           Charleston, WV  25326-1713

For the Defendant:         James M. Cagle, Esq.
                           1200 Boulevard Tower
                           1018 Kanawha Boulevard, East
                           Charleston, WV 25301

Probation Officer:         Beth Srednicki


            _____
              Kimberly Kaufman, RMR, CRR, CRC
              Federal Official Court Reporter
             300 Virginia Street East, Room 6610
                   Charleston, WV 25301

Proceedings recorded by mechanical stenography; transcript
produced by computer.

INDEX

PAGE

VICTIM IMPACT STATEMENT                          35

1          PROCEEDINGS had before The Honorable Joseph R.

2    Goodwin, Judge, United States District Court, Southern

3    District of West Virginia, in Charleston, West Virginia, on

4    May 22, 2019, at 2:30 p.m., as follows:

5               THE COURT:  Good afternoon.

6               COURTROOM DEPUTY CLERK:  The matter before the

7    Court is *United States of America v. Connor Anthony*

8    *Putillion*, Criminal Action No. 2:18-cr-00186.

9               THE COURT:  Is the United States ready to proceed?

10              MS. RADA-HERRALD:  Yes, Your Honor.

11              THE COURT:  Defendant ready?

12              MR. CAGLE:  We are, Your Honor.

13              THE COURT:  Defendant and defense counsel please

14   stand.

15        Madam Clerk, would you administer the oath to Mr.

16   Putillion.

17          **CONNOR ANTHONY PUTILLION, DEFENDANT, SWORN**

18              THE COURT:  Mr. Putillion, on January 24th, 2019,

19   before this court you pleaded guilty to attempted receipt of

20   child pornography in violation of 18 United States Code

21   Sections 2252A(a)(2) and 2252A(b)(1) as charged in Count

22   Three of an indictment returned against you by the grand

23   jury.

24        At the time of your plea hearing, I had rejected the

25   plea agreement that the parties had entered into after

1     learning that the other counts had already been dismissed

2     and the plea agreement had been substantially carried out.

3     In any event, I can't remember if the government objected.

4     I don't know whether I need to make a record or not.

5                 MS. RADA-HERRALD:  I do not recall, Your Honor.  I

6     don't believe there was an objection listed on the record.

7                 THE COURT:  All right.

8         Mr. Putillion, since the time of your guilty plea the

9     United States Probation Office has conducted a presentence

10    investigation of you and prepared a written presentence

11    investigation report.

12        Mr. Cagle, have you and your client received a copy of

13    that report and had an opportunity to review it and discuss

14    it?

15                MR. CAGLE:  Yes, sir, we have, and I did.

16                THE COURT:  Having done so is there any reason why

17    sentencing should not take place today?

18                MR. CAGLE:  No, sir.

19                THE COURT:  Mr. Putillion, have you read the

20    presentence report and discussed it with your lawyer?

21                THE DEFENDANT:  Yes, sir.

22                THE COURT:  Do you understand the contents of the

23    report?

24                THE DEFENDANT:  I do, sir.

25                THE COURT:  Do you understand it?

1              THE DEFENDANT:  Yes.

2              THE COURT:  I've carefully reviewed the probation

3     officer's presentence report and the attached addendum to

4     it.  It appears the government has no remaining objections

5     to the report, but the defendant has eight objections.  Let

6     me address those one at a time.

7              MR. CAGLE:  Yes, sir.

8              THE COURT:  First, the defendant objects to the

9     application of United States Sentencing Guideline Section

10    2G2.2(c)(1), which directs the application of 2G2.1 under

11    certain circumstances.  2G2.2(c)(1) states that, "if the

12    offense involved causing, transporting, permitting or

13    offering or seeking by notice or advertisement a minor to

14    engage in sexually explicit conduct for the purpose of

15    producing a visual depiction of such conduct or for the

16    purpose of transmitting a live visual depiction of such

17    conduct, apply 2G2.1, if the resulting offense is greater

18    than that determined under 2G2.2."

19         I have read the objection and counsel's arguments.

20    Anything further you would like to argue on that, Mr. Cagle?

21             MR. CAGLE:  Judge, no, other than to emphasize

22    that which I have written both when that first came up with

23    the government's objection to the initial report and

24    thereafter.  We think that that provision (c)(1), the

25    cross-reference provision, has no application and has been

1    incorrectly applied to the facts of this case; never would

2    appear to be intended to be applied even under the cited

3    authority from the Eleventh Circuit Court of Appeals, which

4    addresses 2251.  All the cases relied upon there were 2251.

5    The Appendix A is very specific that it does not, at least

6    according to the appendix, apply to this case, nor would it

7    be factually correct to do so.

8            THE COURT:  Ms. Herrald.

9            MS. RADA-HERRALD:  Thank you, Your Honor.  Just

10   briefly, with regard to the argument about what Appendix A

11   contains, Appendix A is the starting point, and obviously we

12   do start there with the offense of conviction.  That takes

13   us to 2G2.2.

14       It is within 2G2.2, which was correctly the beginning

15   point for this offense of conviction, where we find the

16   cross-reference.  And as the United States set forth, that

17   cross-reference does apply in this matter.  That is how we

18   get to 2G2.1.  It's not based upon the offense of

19   conviction.  It is based entirely upon the cross-reference,

20   which is within the proper starting point under the

21   guidelines.

22       As this has been ostensibly briefed by the United

23   States already, I will just point out one thing.  In the

24   *Caniff* decision out of the Eleventh Circuit -- the United

25   States didn't cite to this because it's an unpublished

1    opinion, but that circuit does cite to specifically cases

2    that have dealt with this cross-reference, the

3    cross-reference in 2G2.2(c)(1).

4         Specifically, the Eleventh Circuit notes an unpublished

5    Third Circuit opinion that held that notice for purposes of

6    that cross-reference applies to one-on-one communications,

7    just as seen here.  This is at page 935 to 936 of the *Caniff*

8    decision.

9         It also notes, in the *Caniff* decision, that the Third

10   Circuit unpublished opinion was based upon a prior ruling in

11   another case called *Harrison* that had -- under the prior

12   version of 2G2.2, there was a different provision under

13   (b)(5) that also dealt with this notice and advertisement.

14   And that term of notice had also been used to apply to

15   one-on-one e-mail communications.

16        So there is precedent, within both the guidelines and

17   the similarly worded statute found at 2251, to apply the

18   term notice to one-on-one communications, just as were had

19   in this case.

20        So there are a number of different reasons that notice

21   applies to one-on-one communications and is applicable to

22   the defendant's communications.

23             THE COURT:  Mr. Cagle.

24             MR. CAGLE:  Well, Your Honor, always, when I'm

25   told about an unpublished opinion, I will just say what I

1    would say.  I've never seen the unpublished opinion.  That's

2    sort of not something that I have seen, but I did note that

3    they were not from the Fourth Circuit Court of Appeals.  And

4    I go back to my comments that factually this seems an

5    inappropriate application because of the -- what was at

6    least in the discovery provided as to what the notice -- or

7    what the -- what the communication was.

8         So my argument would be it's not -- it's not within the

9    legal framework, nor is it factually applicable.  And the

10   citation to *Caniff* would indicate that it's applied in 2251.

11   This is a 2252 case.

12        And all of the cases cited by *Caniff* were individuals

13   involved in basically sex slave trafficking, or at least in

14   the sense of child porn industry types, with groups that

15   were passing this kind of porn around on the Internet or

16   through other electronic communications.  That's not what we

17   have here, Judge.

18        And, of course, without getting to the other arguments

19   in my objection, that this seems to be highly -- it seems to

20   be well beyond that which would be contemplated by the

21   conduct here.

22        The government's asking for a minimum of 14 years.

23   It's not a 14-year case.  And I will stand on my comments in

24   that which I submitted to the court.  That's outrageous

25   under the circumstances for this person who made an attempt

1   he's acknowledged to be wrong; we know that.  And he's not

2   in the sex trafficking business.  And to suggest that, the

3   application of this will triple what was originally not only

4   what we had determined to be the appropriate sentence, but,

5   in fact, originally the probation office had determined it

6   to be the appropriate.  Now they want to triple it.

7        He did not get pictures and he did not receive the

8   pictures that are -- that were requested.  Whatever they

9   were, he got nothing.  It's an attempt.  I acknowledge that

10  an attempt is treated as a completed act in the statute.  It

11  is, but it's still an attempt.  He didn't get it.  His

12  situation is distinguishable from *Caniff* and from every

13  other case upon which I've read that *Caniff* relies.

14            THE COURT:  All right.  You can take a seat for a

15  minute while I rule on this.

16       I overrule the defendant's objection.  While reading

17  "by notice or advertisement" as a qualifier to every verb in

18  the guideline is a plausible reading, a more plausible

19  reading limits the qualifier to the word "seeking."

20       The disjunctive "or" before and after "offering"

21  separates the first group of verbs from "seeking by notice

22  or advertisement."  Any other reading would create

23  surplusage and, frankly, impossibilities.  For example,

24  "transporting by notice" seems to be describing impossible

25  conduct.

1           In the case of *United States v. Crandon*, 173 F.3d at

2      page 122, which starts at 122, it says on page 129 that --

3      well, basically on 129 they reject the argument that the

4      language of the cross-reference only pertains to crimes

5      promulgated by "notice or advertisement."  By the way, that

6      Third Circuit case was decided in 1999.

7           Furthermore, as the guideline commentary explains, the

8      cross-reference in (c)(1) is "to be construed broadly and

9      includes all instances where the offense involved employing,

10     using, persuading, inducing, enticing, coercing,

11     transporting, permitting, or offering or seeking by notice

12     or advertisement, a minor to engage in sexually explicit

13     conduct for the purpose of producing any visual depiction of

14     such conduct or for the purpose of transmitting live any

15     visual depiction of such conduct."  And it cites at 2G2.2,

16     comment 7(A).

17          The quote -- and I'm quoting -- "The cross-reference

18     merely implements the common sense notion that a receiver or

19     possessor who has manufactured," or attempted to

20     manufacture, "the pornography in his possession is both more

21     culpable and more dangerous than the one who has received or

22     possessed the pornography and no more."  That's *United*

23     *States v. Dawn,* 129 F.3d at 878, page 884, Seventh Circuit,

24     1997.  Also see *Starr*, 486 F.Supp.2d at 945.

25          "Though the one-on-one electronic communications" --

 1   such as Snapchat here -- "a sexual predator can more easily

 2   isolate and prey on a single vulnerable child victim than if

 3   he sent a widely disseminated notice or ad to many potential

 4   victims."  That's found on page 936 of the *Starr* case.  I'm

 5   not sure that's the *Starr* cite.  I'll check that.

 6        Moreover, the plain weight of authority supports a

 7   finding here today that I've made.  Courts have found that

 8   one-on-one messaging, including e-mail, text messages,

 9   online chats and instant messaging, are all encompassed

10   within the definition of notice.  See *United States v.*

11   *Long*, 304 F.App'x 982 at 986, Third Circuit, 2008.  *United*

12   *States v. Merrill*, 578, F.Supp.2d, 1144 at 1153 out of the

13   Northern District of Iowa, 2008.  See also *United States v.*

14   *Caniff*, 916 F.3d, 929, Eleventh Circuit, 2019.

15        I find that the defendant, through the Snapchat

16   messaging application, sought by notice sexually explicit

17   conduct from the minor victim and I find the cross-reference

18   applies.

19        Give me a second.  What's that 936?

20             MS. RADA-HERRALD:  Your Honor.

21             THE COURT:  Yes, ma'am.

22             MS. RADA-HERRALD:  I believe that's on page 936 of

23   the *Caniff* decision.

24             THE COURT:  Of the *Caniff* decision, very well.

25             MS. RADA-HERRALD:  I had that highlighted already

1   myself.

2             THE COURT:  And a full cite for the *Caniff* is 916

3   F.3d at 929, right?  Is that right?

4             MS. RADA-HERRALD:  Yes, Your Honor.

5             THE COURT:  All right.

6        Next, the defendant objects to the standard conditions

7   of supervised release in paragraphs 97, 101, 102 and 105.

8   Specifically 97:  The defendant shall have no direct or

9   indirect contact at any time for any reason with the victim

10  identified in the presentence report or the victim's family.

11       Let me take them one at a time.  Do you want to add

12  something to your objection to that?

13            MR. CAGLE:  Your Honor, I do want to -- this was

14  sort of an overview of it.  And I give my credit to my

15  client brought this U.S. Supreme Court opinion to my

16  attention is *Packingham v. North Carolina*.  It's a 2017

17  opinion of the U.S. Supreme Court that struck down a North

18  Carolina statute for impermissibly restricting lawful speech

19  in violation of the First Amendment.  I do have a citation

20  on that.  It's not yet in U.S., but it's in 137 Supreme

21  Court 1730.  I think that there are restrictions there in

22  what I guess are the common restrictions placed upon those

23  who find themselves convicted of that which my client finds

24  himself convicted of.  And it seemed to implicate the First

25  Amendment.  And not so much the one you just read, and I'll

1     take them one-by-one.

2           Our objection to the family, as I recollect, would be

3     he's going to have to have some communication, we would

4     hope, at some point with what would be his ex-wife and she's

5     a member of the family.  And it's because they have two

6     children together.  And it would be awful difficult not to

7     have some method of communicating vis-à-vis the children

8     born of their marriage.

9                 THE COURT:  Ms. Herrald.

10                MS. RADA-HERRALD:  Thank you, Your Honor.

11          I believe this may be able to be something that can be

12    remedied through the probation office.  The probation office

13    can work as sort of a go-between as needed.  And to the

14    extent that an arrangement can be worked out where there --

15    direct communication is acceptable to the victim's family,

16    the probation office can facilitate that.  And to the extent

17    that the victim's family would prefer not to have direct

18    communication, communication regarding those children can go

19    through the probation office and be approved by the

20    probation office in advance.

21                THE COURT:  It seems to me that I ought to make

22    clear, in dealing with this objection, that this defendant

23    will be entitled to have contact with his children, but I

24    believe that it will be appropriate that that be done with

25    the approval of his probation officer and in accordance with

```
1     any domestic relations order entered by the state court.
2         Mr. Cagle.
3              MR. CAGLE:  Yes, sir.
4              THE COURT:  Does that sound all right?
5              MR. CAGLE:  Yes, sir.  I mean, honestly, we're
6     talking about things that aren't going to happen in the next
7     few months, so I would think that's fine for now.  I am
8     looking ahead.  Let's assume he's out in, if lucky enough,
9     to be five or six years, you know, by that time everything's
10    going to be electronic, everything.
11             THE COURT:  I understand.  And one of the things
12    that has happened, over the several years that child
13    pornography crimes have been on the books in the federal
14    courts, is the restrictions on supervised release and the
15    wording thereof have gotten longer and longer and longer.
16    And in certain instances, some of which you've raised, I
17    disagree with them.  So we'll try to go through each one of
18    them.
19             MR. CAGLE:  Okay.
20             THE COURT:  But it seems to me that as to that
21    first one, the solution I've stated is perfectly reasonable.
22             MR. CAGLE:  Yes, sir.
23             THE COURT:  The second one is to paragraph 107,
24    the defendant shall not access or possess any material
25    depicting sexually explicit conduct as defined by statute,
```

```
 1    including any photograph, film, video, picture or computer

 2    or computer-generated image or picture, nor shall the

 3    defendant knowingly enter or knowingly remain in any

 4    location, without the prior approval of the probation

 5    officer, where such materials can be accessed, obtained or

 6    viewed, including pictures, photographs, books, writings,

 7    drawings, videos or video games.

 8         Without hearing your argument, I find that overly

 9    broad.  That means you can't go in a public library.  I

10    think a simple statement that this defendant shall not

11    access or possess any material depicting sexually explicit

12    conduct as defined by statute is a valid condition and that

13    is the one I will impose.

14              MR. CAGLE:  Yes.

15              THE COURT:  Does that take care of that?

16              MR. CAGLE:  Yes, sir, it does.

17              THE COURT:  Paragraph 102, the defendant shall not

18    use, purchase, possess, procure or otherwise obtain any

19    computer or electronic device that can be linked to any

20    computer networks, bulletin boards, Internet, Internet

21    service providers or exchange formats involving computers

22    unless approved by the probation officer for such purposes

23    as looking for employment opportunities and submitting

24    applications to perspective employers through the Internet;

25    defendant's lawful gainful employment by a business entity;
```

1    use by immediate family member living in defendant's same

2    household or for other legitimate purpose.  Such computers,

3    computer hardware or software possessed solely by the

4    defendant is subject to searches and seizures by the

5    probation office.

6         Once again, taking your objection into account, I find

7    that overly broad in light of the state of society and of

8    the development of technology today.  I do not think an

9    overly broad restriction on the possession or access of all

10   computer or digital devices is workable in today's society.

11        What I do believe is perfectly workable is to provide,

12   as a condition of supervised release, that, to the extent

13   the defendant has possession of any such device, he must

14   disclose that, before obtaining it or upon obtaining it, to

15   the probation officer and that device shall be subject to

16   search at any time on home visit during the period of

17   supervised release.

18             MR. CAGLE:  Judge, just to be specific, I

19   appreciate that, and as with most of these, are just overly

20   broad and unworkable, frankly, but I will point out

21   refrigerators are computers now.

22             THE COURT:  I know.

23             MR. CAGLE:  And he will not be able to do any

24   banking absent.  He couldn't do any banking before this.

25             THE COURT:  I'm with you on this.

```
 1                MR. CAGLE:  I understand.
 2                THE COURT:  So what I am suggesting, to the extent
 3      that it doesn't become absurd, like the remote-operated
 4      refrigerator or one that talks to you when the ice cream is
 5      frozen, using devices, information-obtaining devices and
 6      display devices that are connected to the Internet, have to
 7      be with the permission of the probation officer and subject
 8      to search.  I'll try to word it as well as I can.
 9                MR. CAGLE:  I understand.
10                THE COURT:  And if the Fourth Circuit wants to
11      reformulate the way I've written it, they are welcome to
12      give it a shot.
13                MR. CAGLE:  I think the court understands our
14      objections and we'll go through them as you wish.
15                THE COURT:  Next, the defendant shall not
16      purchase, possess or consume alcohol or not frequent any
17      business whose primary function is to serve alcoholic
18      beverages.  That's pretty much a standard condition of
19      supervised release.
20           One of the things we expect felons to do is abstain
21      from mind-altering drugs of any sort during the period of
22      their supervised release.  Petitions to modify the
23      conditions or terms of supervised release are always
24      appropriate filings and you'll note that it is a business
25      whose primary function is to serve alcoholic beverages.  So
```

1  going out to dinner at a place where they serve alcoholic

2  beverages is not meant to be prohibited.  What we're trying

3  to do is keep convicted felons from getting drunk or high is

4  what it boils down to.

5            MR. CAGLE:  Understood, Judge.

6            THE COURT:  Any other objections?

7            MR. CAGLE:  I mean, there were other objections.

8  There was one about having to introduce himself as, "Hello.

9  I'm a convicted sex offender."

10            THE COURT:  I've got some more here.

11            MR. CAGLE:  Yeah.

12            THE COURT:  Well, the objections to paragraphs 97,

13  101, 102 and 105 are sustained to the extent announced by

14  the court and overruled in all other respects.

15       The next objection is the defendant objects to the

16  optional condition in paragraph 107, which says:  The

17  defendant shall not associate or have verbal, written,

18  telephonic or electronic communications with any minor,

19  except in the presence of the parent or legal guardian of

20  said minor, on the condition that the defendant notifies the

21  parent or legal guardian of the defendant's sex offender

22  conviction and with written approval from the probation

23  officer.  This provision does not encompass minors working

24  as waiters, cashiers, ticket vendors, and similar service

25  personnel with whom the defendant must deal in order to

```
1    obtain ordinary and usual commercial services.

2         While the court finds that the probation staff, and no

3    doubt probation staffers in Washington and others have made

4    a valiant attempt to write something workable, I don't think

5    this is workable either.  This defendant may not be in the

6    company of a minor without another adult being present at

7    the time.

8              MR. CAGLE:  Would that include his own children?

9              THE COURT:  I will leave that up to the -- I

10   assume the good sense of the domestic relations judge or

11   circuit court judge that's handling -- is the divorce over?

12             MR. CAGLE:  Yes, it is.

13             THE COURT:  What do they say about visitation?

14             MR. CAGLE:  Well, it doesn't have any because he's

15   incarcerated, so he's still restricted.

16             THE COURT:  Well, whenever it happens, they can

17   decide that.  There always was, quite sensibly, in federal

18   jurisdiction an exception in our jurisdiction for cases

19   involving domestic relations and I'm going to continue to

20   honor that tradition and stay out of it.

21             MR. CAGLE:  It's a good decision.

22             THE COURT:  It's obvious to me that we send people

23   to jail and put them on supervision for a number of reasons:

24   For punishment, for deterrence and for protection of the

25   public.  What we don't do is send people to jail or put them
```

1    on supervised release for those conditions to further punish

2    them in different ways.  So I'm going to leave it as no

3    association with children, when he's alone without another

4    adult, except as permitted by his probation officer or as

5    allowed by domestic relations court order.

6        Since that's the first and only time I've said that,

7    we'll need to get that out of the transcript.

8        Do you want to have an objection to that?

9            MS. RADA-HERRALD:  Yes, Your Honor, the United

10   States would just preserve an objection to that.  Thank you.

11           THE COURT:  Again, I welcome any rewrites.

12       So the objection is sustained to the extent that I have

13   said so and overruled to the extent that I have permitted

14   such associations.

15       The defendant objects to the optional condition in

16   paragraph 108, which states:  The defendant shall not loiter

17   within 100 feet of any parks, school property, playgrounds,

18   arcades, amusement parks, day care centers, swimming pools,

19   community recreation fields, zoos, youth centers, video

20   arcades, carnivals, circuses or other places that are

21   primarily used or can reasonably be expected to be used by

22   minors without prior written permission of the probation

23   officer.

24           MR. CAGLE:  Your Honor, the reason for that has to

25   do with visitation with his children in where he might want

1    to take children.  Just, for example, if his kid is playing

2    little league baseball or a swimming pool or something.

3             MS. RADA-HERRALD:  Your Honor, there's already an

4    exception carved out for prior approval from the probation

5    office and the defendant could easily get prior written

6    approval to take his children to a swimming pool.

7             THE COURT:  I, again, think this is an overly

8    broad statement and not a very inclusive one.  It attempts

9    to include everywhere you might find kids, but I can think

10   of another several dozen places where kids primarily hang

11   out that they haven't figured out to put in this paragraph

12   yet.

13        The general idea is we don't want you loitering around

14   children, period, and that should not be necessarily place

15   based.  I have a hard time with the word loitering and with

16   the juris prudence with regard to constitutionality of

17   loitering statutes.

18        I think the best way I can do this is to say that the

19   defendant may not hang out, loiter, or spend time -- I don't

20   know how to say it.  I have to think of a way.

21             MS. RADA-HERRALD:  Your Honor, might I suggest an

22   amendment that Judge Copenhaver has made on several

23   occasions to this.  He has amended it to state the defendant

24   shall not enter any park, school property, et cetera.  He

25   removes the loiter within 100 feet of and changes that to

1    enter.

2           THE COURT:  I think that works out just fine.  I

3    still think it is not inclusive.  There are lots of other

4    places, like skateboard parks, not mentioned there, roller

5    skating rinks, ice skating rinks.  I mean, if we try to be

6    all-inclusive, we end up being silly.

7       The defendant needs to stay away from places where

8    there are mostly kids hanging out where he would be

9    observing them.

10      I'm going to say I will adopt Judge Copenhaver's

11   wording and make the word enter rather than loiter -- rather

12   than loiter within 100 feet and still say, for your

13   purposes, Mr. Cagle, that I think the following language is

14   very broad and suspect.

15          MR. CAGLE:  Yeah, the overarching concern, Judge,

16   we had was it's as if he could get in trouble in unintended

17   ways, that he has no animus toward doing anything that is

18   wrong, and yet he could be in violation of this.

19          THE COURT:  I can tell you this is just anecdotal,

20   but it's the best I have for you, that, in 25 years of

21   handling these cases, I've never had somebody brought before

22   me for violating because they went to the circus or any of

23   these other places.  The probation officers have good sense.

24   Your client gets in trouble if he acts like a sex offender

25   and does things that makes people nervous.  So I'm going to

```
1     leave it worded as it is and you can take it up with the

2     Fourth Circuit.

3              MR. CAGLE:  I really don't want to, but I might

4     have to.  I understand.

5              THE COURT:  The defendant objects to the optional

6     condition in paragraph 109 that defendant not purchase,

7     possess or control cameras, cam corders or movie cameras

8     without prior approval of the probation officer.

9         The defendant may only use or possess cell phones that

10    are limited by design to vocal telephone communication

11    without the capability to access the Internet or store or

12    create images or video without prior approval of the

13    probation officer.

14        I'm not going to impose that condition.  I think it's

15    totally unrealistic.  I'm sure you can still buy flip phones

16    for old people that are simple phones, but hopefully Mr.

17    Putillion, after serving what's going to be a very

18    considerable period in prison, will be able to reintegrate

19    into society, and with what is going to be very careful

20    supervision, be able to reestablish himself as a citizen of

21    the community.  So I'm not going to impose that condition.

22        I'll show your objection.

23              MS. RADA-HERRALD:  I did just want to suggest an

24    alternative, in addition to preserving the United States'

25    objection, that there at least be some requirement that any
```

 1     such devices that may exist in the future that he possesses

 2     must be disclosed and subject to review by the probation

 3     office.

 4             THE COURT:  I agree to the extent that they are

 5     able to access the Internet, which I can't imagine anything

 6     that wouldn't.  Anyway --

 7             MS. RADA-HERRALD:  Primarily, given some of the

 8     conduct that is included in the PSR regarding the defendant,

 9     frankly anything that has a recording device I think the

10     defendant should be required to disclose the possession of

11     to the probation officer given that he took surreptitious

12     videos of a victim.

13             THE COURT:  All right.  I'll do that too.

14             MR. CAGLE:  Judge, I just don't want to leave

15     that -- any comment I have unstated here.  I go back to this

16     *Packingham* decision of the U.S. Supreme Court and it seems

17     to me -- I mean, the statute in North Carolina says you

18     can't get on Twitter, Facebook, anything --

19             THE COURT:  I'm not saying you can't do it.  I'm

20     saying it's going to be subject to search.

21             MR. CAGLE:  Well, if you leave the authority to a

22     probation officer, the probation officer shouldn't have any

23     more authority than the state of that case, North Carolina,

24     had.

25             THE COURT:  I think North Carolina -- I'm sorry.

1    I'm not meaning to argue with you, Mr. Cagle, although we

2    might enjoy that.  What I'm trying to do is fashion

3    realistic conditions and I don't think the ones that are

4    standing conditions now are very well thought out.

5         This tries to prohibit -- let me go back over it.  This

6    tries to prohibit visual recorders and cell phones with

7    access to the Internet and the ability to create images or

8    video.  I don't know -- I don't know what the *Packingham* --

9    is that the name of the case?

10             MR. CAGLE:  *Packingham*.

11             THE COURT:  I don't know what that case says, but

12   I think this is unduly restrictive for modern-day society

13   and I sustain the objection to the extent it prohibits the

14   defendant from having such devices.

15        I do order that he disclose the purchase or acquisition

16   of any such item, even for a limited time, to his probation

17   officer and that such items be subject to search by the

18   probation officer.  And if that violates *Packingham*, the

19   Fourth Circuit can straighten that out.  I don't mean to be

20   flip about it.  I'm just trying to do the best I can.

21             MR. CAGLE:  Okay.

22             THE COURT:  I fortunately have somebody that hands

23   me stuff.  *Packingham* mainly dealt with content

24   restrictions, like the use of social media and so forth.

25             MR. CAGLE:  Yes, it did.  I mean, that was the

1    focus of it, but the whole point being, though, that that

2    enjoys some First Amendment protection to be able to access

3    those things.

4         In looking ahead to a number of years, I can't imagine

5    the pace that these electronic devices are being produced

6    and what they are capable of, that this will be like the

7    Stone Age.

8              THE COURT:  Any federal district judge that's

9    still hanging around can change these conditions at any

10   time.

11             MR. CAGLE:  Yes, sir.

12             THE COURT:  What I'm required to do now is impose

13   reasonable restrictions and give the defendant notice of

14   them.  I'm trying to do that.

15        All right.  The next one is the defendant objects to

16   the condition in paragraph 110 that the defendant notify

17   employers, families, friends and others with whom the

18   defendant has regular contact of his convictions as a sex

19   offender and that the defendant is being supervised by a

20   probation officer.

21        Do you want to argue that?

22             MR. CAGLE:  Yes, sir.  That would appear to

23   require him to tell virtually anybody he comes into contact

24   with that, "Hey, I'm a sex offender."  And we laughed about

25   it.  It wasn't funny, really, but, "Hey, I'm Connor

1    Putillion and I'm a registered sex offender."  That would be

2    his greeting.  And I can't imagine that that's -- that is an

3    appropriate condition and that somebody would be in

4    violation of it, that if he met a friend, after release from

5    prison, that he would -- he would have to first tell them,

6    "Hey, I'm a registered sex offender."

7                    THE COURT:  Ms. Herrald.

8                    MS. RADA-HERRALD:  Your Honor, this isn't an

9    condition that applies to every casual encounter the

10   defendant has.  These are people he has regular contact with

11   and particularly in the scope of employment --

12                   THE COURT:  Isn't that a requirement of the

13   statute -- by statute for registered sex offenders?

14                   MS. RADA-HERRALD:  Registered sex offenders must

15   register their employment, but I do not believe there's a

16   criminal provision that requires that they notify employers.

17   The United States would submit that, particularly with

18   regard to employers, it is important that he notify them of

19   his status as a sex offender who is being monitored by the

20   probation office to ensure that he's not employed in a

21   capacity where he would have any contact with minors.

22                   THE COURT:  I'm not going to do it.  I'm not going

23   to impose this condition at all.  We don't require axe

24   murderers to tell their employers that they're axe

25   murderers.  We don't require some of the most heinous

```
 1   criminals in any other area to tell.  We don't require
 2   people who are slinging drugs that are killing more people
 3   in West Virginia than we killed in the Vietnam War that they
 4   have to tell their employers that they're drug addicts or
 5   that they've been convicted of a drug crime.
 6        Most employers have a blank on their employment form
 7   that says:  Have you ever been convicted of a felony?  That
 8   would cover this.  And if he lied about it, that would be a
 9   problem, but I'll give you -- I'll save your objection to
10   it.
11             MS. RADA-HERRALD:  The United States would just
12   like to note, as part of its objection, that sex offenders,
13   based upon the Sex Offender Registration Act and Adam Walsh,
14   are treated differently than other types of offenders.
15             THE COURT:  And to the extent that the Congress of
16   the United States has done that, I'm for it.  To the extent
17   that I am asked to do it, I won't.
18             MS. RADA-HERRALD:  Thank you, Your Honor.
19             THE COURT:  So that objection is sustained.
20        The defendant objects to the optional conditions listed
21   in paragraphs 114, 115 and 117.  114 says:  The defendant
22   shall not possess minor's clothing, toys, games and the like
23   without permission of the probation officer.
24        115 says:  The defendant shall not be employed in any
25   position or participate as a volunteer in any activity that
```

```
 1    involves contact with minors without written permission from
 2    the probation officer.  The defendant may not engage in any
 3    activity that involves being in a position of trust or
 4    authority over any minor.
 5         117 says:  The defendant shall not possess pictures of
 6    minors unless the pictures are of the defendant's children.
 7         I find these conditions somewhat draconian, but I will
 8    overrule the objection insofar as it limits the pictures he
 9    possesses to his own children.  That restriction will remain
10    in place.
11         I will not prohibit him from participating in
12    activities that involves contact with minors without written
13    prohibition.
14         There seem to be probably -- I don't know.  Maybe not
15    in West Virginia, but in most places about half the people
16    are minors, so it would be pretty hard to engage in any
17    activity where there aren't minors.
18         I will impose the restriction on possessing minor's
19    clothing, toys and games without permission of the probation
20    officer, which will not be unreasonably withheld with regard
21    to someone who has minor children.
22         I'll show the objection of the government.  And do you
23    need any objection on this?
24              MR. CAGLE:  Judge, the only thing, 117, it was our
25    point here -- and my client brought it up -- what if he got
```

1    a picture of his son who's in a classroom setting and there

2    are other children shown?  If you get the class photo, for

3    example.

4         THE COURT:  If I start down the slippery slope of

5    saying it's okay for classrooms, then it becomes okay for

6    swim meets and track meets and basketball games and parades

7    and so forth.  I'm going to do this and that's going to be

8    part of the penalty that's imposed for him committing these

9    crimes.

10        Okay.  The eighth objection is to the optional

11   condition in 116.  There the defendant -- it requires that

12   the defendant shall participate in the district's computer

13   and Internet monitoring program and pay any costs associated

14   therewith and abide by all special conditions therein as

15   directed by the probation officer.  Participation in this

16   program is contingent upon all program criteria being met.

17        I don't mean to be super critical of the probation

18   staff, but I don't even understand what that means.

19        MR. CAGLE:  Our objection is I don't know what

20   he's being placed on notice for.  I don't know what this

21   refers to.

22        THE COURT:  At the direction -- this will be the

23   thing.  The defendant shall allow the probation officer to

24   monitor any use of computers or devices which may access the

25   Internet.

```
 1          Any other objections?

 2               MR. CAGLE:  No, sir.

 3               MS. RADA-HERRALD:  Your Honor.

 4               THE COURT:  Yes, ma'am.

 5               MS. RADA-HERRALD:  With regard to that condition,

 6      I believe one of the purposes of that is the software and

 7      programs that are utilized to monitor these computers, which

 8      obviously may be different from when defendant is actually

 9      on supervised release, do incur a fairly substantial cost to

10      the probation office and that is one of the reasons that

11      these defendants are, as part of the condition, required to

12      pay the cost of those monitoring programs.  To the extent

13      that they choose to have computer equipment and use it, they

14      are responsible for the cost of monitoring it.  So I would

15      ask that that also be included on the amended --

16               THE COURT:  I'm not going to do it simply because

17      I have no idea what the technology will be like in two years

18      from now, much less whatever the sentence might be.  Right

19      now we're still stringing cable in every courthouse in

20      America to put up cameras and to put those fancy locks on

21      doors with lights on them and we already have wireless

22      technology, which will allow us to have the cameras be

23      wireless.  We are always about 10 or 15 years behind

24      technology with the federal government.  I don't know what

25      it's going to be.
```

```
 1           This defendant can't misbehave and can't disobey the
 2     law.  He's got to behave himself and he's got to report as
 3     often to the probation officer as the probation officer
 4     tells him to.
 5                MR. CAGLE:  Judge, just one comment.  I think you
 6     sustained our objection here, but nevertheless, the -- I
 7     will point out what the prosecution has said, I don't know
 8     that Mr. Putillion will be able to afford the program and I
 9     don't think there would be -- I don't know what their
10     provision is.
11                THE COURT:  I'm not going to impose it.
12                MR. CAGLE:  Thank you.
13                THE COURT:  Mr. Putillion, do you have any
14     additional objections?
15                THE DEFENDANT:  No, Your Honor.
16                THE COURT:  Are you completely satisfied with the
17     legal representation that you've received from your lawyer
18     from the beginning of his representation until today?
19                THE DEFENDANT:  Yes, sir.
20                THE COURT:  I find sufficient indicia of
21     reliability to support the probable accuracy of the matters
22     contained in the presentence report and the addendum
23     thereto.  I adopt the presentence investigation report and
24     the addendum, except as otherwise noted in this hearing.
25           I direct the probation office to file a copy of the
```

1     presence investigation report in the court file under

2     seal.

3          The defendant stands convicted of attempted receipt of

4     child pornography in violation of 18 United States Code

5     Section 2252A(a)(2) and 2252A(b)(1).

6          Federal law provides the following maximum penalties

7     for violating this statute:  A term of imprisonment of not

8     less than five years and not more than 20 years, a period of

9     supervised release of five years to life, a fine of

10    $250,000, restitution, a special assessment of $100, and an

11    additional special assessment of $5,000, and an order of

12    restitution, if one is sought.

13         Is there restitution sought in this case?

14             MS. RADA-HERRALD:  There has not been anything

15    filed, Your Honor.

16             THE COURT:  Very well.  That will not be included.

17    The United States sentencing guidelines, Mr. Putillion, are

18    advisory and are not binding on this court.  Nevertheless,

19    while I may not presume them to be reasonable, I am required

20    to carefully calculate them and consider them when arriving

21    at a just sentence.  I must also consider the sentencing

22    factors enumerated in 18 United States Code Section 3553(a).

23    Let me begin by calculating the advisory United States

24    sentencing guideline range.

25         The relevant guideline is found in Section 2G2.1 and

1    provides for a base offense level of 32.

2        2G2.1(b)(1)(B) applies if the minor has obtained the

3    age of 12 years, but not the age of 16 years.  That applies

4    here and increases the offense level to 34.

5        Section 2G2.1(b)(5) applies if the defendant was a

6    parent, relative or legal guardian of any minor involved in

7    the offense.  That applies and it increases the offense to

8    36.

9        If the use of a computer or an inactive computer

10   service is used for the purpose of persuading, inducing,

11   enticing, coercing, for seeking or facilitating, helping out

12   on the crime, you get an additional two points.  Almost all

13   of them are any more, but that applies here.  That makes the

14   offense level 38.

15       Section 3E1.1(a) provides for a two-level decrease if

16   the defendant, prior to conviction, has assisted authorities

17   in the investigation and prosecution of his own misconduct.

18   I find, based on my adoption of the presentence report, that

19   this defendant has done so and is awarded the two points for

20   acceptance of responsibility.

21       Section 3E1.1(a) provides for an additional or -- 1(b)

22   provides for an additional one-level decrease if the

23   level -- offense level, prior to the adjustment for

24   acceptance of responsibility, is 16 or greater, and the

25   government so moves stating that the defendant has assisted

1    authorities in the investigation and prosecution of his own

2    misconduct, timely notifying the government of his intention

3    to plead guilty and permitting the government to avoid

4    preparation for trial, and permitting the government and

5    court to allocate their resources efficiently.

6         Does the government so move?

7              MS. RADA-HERRALD:  Yes, Your Honor.

8              THE COURT:  I grant the motion.  The third point

9    is awarded.  That decreases the offense level to 35.

10        The court finds that the total offense level is 35.

11        The defendant has no criminal history for which

12   criminal history points attach.  That establishes a category

13   of criminal history of one.

14        Given a total offense level of 35 and a criminal

15   history category of one, the advisory United States

16   sentencing guideline range is as follows:  A term of

17   imprisonment of 168 to 210 months, a period of supervised

18   release of five years to life, a fine of 40,000 to $250,000,

19   restitution, and a special assessment of $100.

20        Mr. Cagle, other than your previous objections, is

21   there anything you or Mr. Putillion would like to say with

22   regard to the guideline calculations?

23             MR. CAGLE:  Your Honor, I'll stand on what I filed

24   with this court.  I don't need -- the court's read it.  I've

25   got arguments that I think would support a variance

```
 1    considering your final decision.  Mr. Putillion did want to
 2    read something to the court.
 3              THE COURT:  We're going to get to that.  This is a
 4    three-step dance.
 5              MR. CAGLE:  I've gotcha.  All right.
 6              THE COURT:  Ms. Herrald, anything the government
 7    would like to say concerning the guideline calculations?
 8              MS. RADA-HERRALD:  No, Your Honor.
 9              THE COURT:  Section 3553(a) of Title 18 provides
10    several factors that the court must consider when
11    determining an appropriate sentence.  Counsel are very
12    familiar with that and have briefed that in their sentencing
13    memorandum.
14         Anything further on the 3553(a) factors, Mr. Cagle?
15              MR. CAGLE:  No, sir.
16              THE COURT:  Anything further, Ms. Herrald?
17              MS. RADA-HERRALD:  Just briefly, Your Honor.  The
18    United States has briefed this extensively, but did just
19    want to reiterate a few points.  This is particularly
20    egregious conduct.  This is a violation of a trusted
21    relationship involving a minor the defendant had known since
22    she was a very little girl and she still is a young girl.
23         His conduct goes beyond that.  There's possession of
24    child pornography of an unknown minor.  There are
25    surreptitious videos taken of another victim that are
```

1  obviously also very concerning and the subject of charges in

2  Jackson County.

3          And with regard to the comparison to other cases in

4  this district, this conduct the defendant engaged in for

5  which he is convicted while he was charged and convicted of

6  the attempted receipt that fundamentally involved, as the

7  court noted, the production of sexually explicit images.  If

8  that request had been fulfilled, it would have involved the

9  production of child pornography by a 13-year-old.

10          And the guidelines, under the cross-reference, are

11  actually still below the mandatory minimum for a production

12  offense, which is 15 years.  A sentence within those

13  guideline range is consistent with other defendants who have

14  engaged in this same type of conduct, that is production.

15  That is the conduct in this case, even if it is not

16  specifically the offense of conviction.  That's what we look

17  to under 3553(a) is the conduct.

18          And the cases that were pointed out in the sentencing

19  memos involved sentences 18 years up to 30 years for the

20  statutory maximum.  The statutory maximum is imposed -- it's

21  not an unusual circumstance for 30 years to be imposed in a

22  production case.  So the guidelines here are imminently

23  reasonable given the defendant's conduct and gross violation

24  of a 13-year-old girl who trusted him.  And for that reason,

25  in addition to everything argued in its sentencing memo, the

1    United States believes that a guideline sentence, in

2    addition to at least 15 years of supervision, is

3    appropriate.

4              THE COURT:  All right.

5              MR. CAGLE:  Your Honor, may I --

6              THE COURT:  Having disposed of the 3553(a)

7    factors, I'll consider your sentencing memorandum and your

8    arguments.

9         Ms. Herrald, anything that the government would like to

10   offer to the court, by argument or evidence, prior to

11   imposing sentence?

12        You can take a seat, Mr. Putillion.  It will be

13   your-all's turn in a bit.

14             MS. RADA-HERRALD:  My understanding, Your Honor,

15   is that the victim, "AT," would like to address the court.

16             THE COURT:  Very well.  She may do so from the

17   podium.

18             MS. RADA-HERRALD:  She has also asked if I can

19   stand at the podium with her.

20             THE COURT:  You may.

21             MS. RADA-HERRALD:  Thank you, Your Honor.

22                   **VICTIM IMPACT STATEMENT**

23             THE WITNESS:  Your Honor, I'm aware that you have

24   already observed my letter.

25             THE COURT:  Could you scoot the microphone over

VICTIM IMPACT STATEMENT

1    just a little bit?

2         THE WITNESS:  I'm aware that you've already

3    observed my letter, but I wanted to read it again to the

4    court.  And before I do so, I just wanted to say that

5    although this occurrence that happened when I was 13 years

6    old did strengthen me to be the 15-year-old girl I am now, I

7    hope that it does not occur to anybody else.

8         To Whom It May Concern:

9         Have you ever been traumatized?  The Webster Dictionary

10   states trauma is defined:  Subject to lasting shock as a

11   result of an emotionally disturbing experience and physical

12   injury.

13        I know a girl, a girl who at the age of 13 was

14   traumatized and forever will be her entire life.  A girl who

15   was so desperate for someone's love and approval at a time

16   in her life.  A girl with anxiety, depression, hypochondria,

17   severe anxiety, a brother whom was never home --

18        THE COURT:  Slow down just a tiny bit, please.

19        THE WITNESS:  -- family members she thought would

20   never accept her, bullies at school, from adult to child,

21   all on one tiny little girl's shoulders from what felt like

22   the day she was born.

23        That same girl, at only the age of 13 years old,

24   encountered a monster in her own backyard.  This girl was

25   compelled by a man she believed would be the brother she

1    never had, wanted to listen, through all the troubles she

2    had encountered at such a young age that was truly her

3    entire life.

4         As life would have it for her, the character that was

5    portrayed to her as broad and strong and determined,

6    thoughtful, charming and intelligent was exactly that, but

7    in all the wrong ways.

8         Being broad and strong gave him abilities to increase

9    the fear he wanted to instill in her.  Being determined

10   allowed him to progress through his plans of deceit no

11   matter what he had to do.  His thoughtfulness was nothing

12   but a tactic to lure her into his prey, along with the

13   charming side of him.  The intelligence he withheld only

14   made it detrimental to her escape, physically and mentally

15   seeing that he would always know what he was doing and how

16   he was to do it and when.

17        What better person and better time?

18        This girl took a step, a step to tell a secret she

19   swore to never tell, not just to him, but to herself, in

20   hopes that maybe you or anyone can make a difference.

21        Now, at age 15, a life still ahead of her, she fears

22   any and every man that not only walks by, but dwells within

23   her own life.  With two young nephews at home, she lays

24   awake wondering if they were to genetically carry the

25   factors their father had and how she can possibly protect

VICTIM IMPACT STATEMENT

1   them from that.

2        For months at a time, when she couldn't sleep, she

3   dreamed of the revenge that he may have for her.  Not just

4   any dreams, but dreams of death to all that she loved, but

5   for her only to watch.  A girl at such age should never have

6   the conception of what has happened to her, but she does and

7   she always will, no matter how many appointments or

8   prescribed medicines, no matter how many times she hears it

9   will be okay or how many times she smiles through her hidden

10  story.

11       The worst part is that girl is me.

12            THE COURT:  Anything further, Ms. Herrald?

13            MS. RADA-HERRALD:  No, Your Honor.

14            THE COURT:  All right.  Mr. Cagle, anything that

15  you or your client would like to say before I impose

16  sentence, or do you have any witnesses?

17            MR. CAGLE:  My client does wish to speak, Your

18  Honor.

19            THE COURT:  All right.  If you would speak right

20  into that microphone, please.

21            THE DEFENDANT:  Your Honor, I've always been

22  someone that has taken responsibility for my actions.  That

23  is a value that I have held dearly my whole life.

24  Regardless of the outcome that has faced me, I've always

25  been the one in the room to raise my hand and say that I was

1    the one who did it.

2        At a very young age I felt that I was the one who had a

3    responsibility to serve my country and help those around me.

4    I dreamed of being a Marine and days after my 17th birthday

5    I signed the papers to make it so.  While in the Marines, it

6    actually became a goal of mine to become a West Virginian

7    State Police Officer and repay the state that had taught me

8    so much for being a man.  Obviously these goals are no

9    longer feasible in my life.

10       While in the Marines I had gotten my fiancee pregnant

11   and I was faced once again with another decision.  My

12   options were to take responsibility for my actions and be a

13   father, or I could cover it up and I could discard the

14   people that I loved from my life.

15       Once again, however, I took responsibility knowing that

16   the repercussions would force me to leave one of the most

17   elite units in the Marine Corps, a unit of presidential

18   security of less than 300 active Marines out of 187,000

19   Marines would have the opportunity to serve in.

20       However, due to my good record and rapport with my

21   senior officers, they sent me to another high-level unit at

22   the Pentagon and they allowed me the opportunity to be close

23   to my child and my wife.

24       While being a father, it was absolutely the most

25   rewarding time in my life.  When these allegations came to

1   light, and in more ways than one, it was her word against

2   mine.  However, I did what I thought was right and I took

3   responsibility for what I did.  And when I did so, and it

4   came out to my wife, I knew that I automatically had sealed

5   myself to be in prison.  This was something I'd been

6   expecting for a while now, ever since I sent that e-mail.

7       I knew that I would lose my children.  I knew that I

8   would lose my career.  I would lose my freedom and I would

9   lose my family and the people that I love and the people

10  that still love me that I may never have the opportunity

11  to -- that I may never have the opportunity to be with

12  again.

13      I'm sorry for what I've done.  My actions were wrong

14  and they were unlawful and I've brought shame to myself, to

15  my family, to my two boys, and to my country.  I hope that

16  you can see through what I've done and see who I used to be

17  and who I can still be.  I can be a loving father.  I can be

18  a productive member of society.  I can be a good man.  And I

19  hope that you can see through to the man that I am and that

20  I can be and that you'll instill the confidence in me to

21  give me a second opportunity at life.

22      And I'd also -- I don't know really if I'm allowed to

23  do this, but I'm sorry, guys, really.  I really am.  I know

24  I messed up and it's not your guys' fault.

25          THE COURT:  Tell me why you received a less than

 1    honorable discharge from the Marines.

 2             THE DEFENDANT:  Due to my charges.  I was on track

 3    to receive an honorable discharge.  I was about to actually

 4    receive an ankle surgery and then more than likely get

 5    medically discharged.

 6             THE COURT:  So this occurred before you were

 7    discharged?

 8             THE DEFENDANT:  Yes, sir.  I got arrested on days

 9    and I went to jail in uniform.  It was pretty --

10             THE COURT:  That just wasn't clear to me from the

11    report.

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  Anything further?

14             THE DEFENDANT:  No, sir.

15             THE COURT:  All right.  The court will be in

16    recess for ten minutes.

17         (Recess held from 3:40 p.m. to 3:50 p.m.)

18             THE COURT:  All right.  Mr. Putillion, if you and

19    your lawyer would stand again.

20         It is the judgment of the court that the defendant be

21    committed to the custody of the Federal Bureau of Prisons

22    for a term of 96 months.

23         Upon release from prison, the defendant shall be placed

24    on supervised release for a term of 25 years.

25         Within 72 hours of your release from prison, you shall

1      report in person to the probation office in the district to

2      which you're released.

3           While you're on supervised release, you must not commit

4      another federal, state or local offense; you must not

5      possess any dangerous device or firearm; you must not

6      possess any unlawful controlled substance; you must comply

7      with the standard terms and conditions of supervised

8      release, including the special conditions that are set forth

9      in the presentence report as modified by me here today.

10          You are also subject to our local rules of criminal

11     procedure, which contain certain standard conditions.

12          I find that you don't have the resources to pay a fine

13     now and are unlikely to become likely to pay a fine in the

14     future and I impose no fine.

15          There being no request for restitution, the court does

16     not order restitution.

17          I order you to pay the special assessment of $100, plus

18     the $5,000 special assessment.

19          Finally, after considering the advisory guideline range

20     and the applicable factors from 3553(a) of Title 18, I find

21     that the sentence of 96 months, followed by 25 years of

22     supervised release, is reasonable and appropriate for a

23     number of reasons:

24          Section 2G2.2, the child pornography guideline, is not,

25     in my opinion, entitled to the usual deference due the

1       guidelines.  The Sentencing Commission was established to

2       eliminate gross disparities in sentencing, to control crime

3       through incapacitation and deterrence and to rehabilitate

4       offenders.

5           The sentencing guidelines are generally the product of

6       careful study, based on extensive empirical evidence,

7       derived from the review of thousands of individual

8       sentencing decisions.  Some, however, like this guideline

9       2G2.2, are not grounded in empirical analysis, but rather

10      are statutory directives.

11          The Supreme Court has recognized that such guidelines

12      do not exemplify the Commission's exercise of its

13      characteristic institutional role; that's in *Kimbrough*.  The

14      sentences recommended by 2G2.2 are simply too long, in my

15      opinion.

16          While I do not categorically reject the child

17      pornography guidelines, I do not give them the same weight

18      as I accord other guidelines.

19          I should also note that the sentence for the actual

20      sexual abuse of a minor has a base offense level of 18.  At

21      a criminal history category of one, a total offense level of

22      18 carries a sentence of 27 to 33 months with no mandatory

23      minimum.

24          The maximum term of imprisonment for the use of a minor

25      to produce obscene matter or assist in doing sexually

1     explicit conduct, under West Virginia state law, is a

2     maximum of ten years' imprisonment.

3          Giving full weight here to the guidelines would produce

4     the result of at least 168 months, 14 years.  As defense

5     counsel has pointed out, not applying the cross-reference

6     would have resulted in a guideline range of 30 to 37 months

7     before considering the mandatory minimum.

8          Mr. Putillion is a 22-year-old appearing for his first

9     federal conviction with no criminal history.  He reports

10    having a good childhood and denies any instances of abuse or

11    neglect.  He has two children who now live with his ex-wife.

12         Mr. Putillion reports that he suffers from anxiety and

13    is currently prescribed medication.  He denies any past or

14    current thoughts of suicide.

15         He does have a history of drug abuse.  While living in

16    D.C., he was snorting Suboxone, Xanax and Klonopin

17    approximately three to four times per week.  He claims that

18    he took niacin to cleanse his system before he took

19    employment drug screens.

20         He enlisted in the U.S. Marine Corps and prior to his

21    discharge served as a member of the Presidential Security

22    detail at the Pentagon and then as an infantry soldier.

23    Prior to the instant offense, by all accounts, he appeared

24    to be a productive member of society, but I wonder if the

25    time in Washington that you were serving on the Presidential

1  Security Program, was that the same time you were abusing,

2  snorting Suboxone, Xanax and Klonopin?

3              THE DEFENDANT:  That was not, sir.

4              THE COURT:  I will assume it wasn't.

5       Here you drove "AT" from West Virginia to Alexandria

6  while you played what you called the nervous game, slowly

7  moving your hand up her inner thigh until she became

8  nervous.  You sought numerous times nude photographs using

9  the Snapchat application.  Your cellular phone contained

10  videos of unknown pubescent females engaging in sexual

11  conduct.

12       A search history of your cell phone included Web

13  searches for the best daddy teen girls, amateur teens,

14  Disney princess porn and new naked young girls.

15       It should be noted that there are pending charges

16  against Mr. Putillion in state court for sexual assault and

17  soliciting a minor.

18       I would tell you that while your sentence, as I have

19  imposed it, is below the guideline range with the

20  enhancement, it is somewhat higher than I would normally

21  impose with my disagreement with the guidelines and that is

22  principally because your behavior in this case is abhorrent

23  and your statement to the court was very unpersuasive.

24       I included a very long term of supervised release

25  because I have very little confidence that you will be able

1    to control your impulses.  You had to know that with a close

2    relative and with the requests you were making that there

3    was a very good chance that you would be caught, but you

4    couldn't stop.  Nine years is a long time.

5        For reasons other than that discussed, does counsel for

6    the defendant or government know of any reason why sentence

7    should not now be imposed as stated?

8            MS. RADA-HERRALD:  No, Your Honor.

9            MR. CAGLE:  No, Your Honor.

10      I would ask that the court recommend Lexington, if at

11    all possible.

12          THE COURT:  I will recommend it if it's deemed

13    suitable by the Bureau of Prisons for his offense.

14          MR. CAGLE:  Yes.

15          THE COURT:  But I recognize that it is somewhat

16    close to home and is a facility that may well be

17    appropriate, so I'll put that recommendation in.

18          MR. CAGLE:  Thank you.

19          THE COURT:  Anything further?

20          MS. RADA-HERRALD:  Briefly, Your Honor, just back

21    to the very beginning of the hearing, I did just want to

22    clarify, I realized it was a bit unclear in the record, you

23    had asked about an objection by the United States with

24    regard to the dismissal of the remaining charges in the case

25    and the rejection of the plea agreement.

1          The United States does not have an objection to the

2     dismissal of the charges, as that was part of the plea

3     agreement, but the United States did want to preserve its

4     objection to the rejection of the plea agreement itself.

5          THE COURT:  Okay.  The only thing I would say to

6     that is that the plea agreement, in order to be carried out

7     under the rules and under the established law in this

8     country, has to be carried out after approval by the court.

9     And the time that it was carried out almost all substantive

10    parts, I had not approved the plea agreement.

11         I recognize that there were things like restrictions on

12    rights to appeal and so forth that remained of the plea

13    agreement.  I think the words I used at the time was it was

14    moot, but that's not technically correct.  And so to the

15    extent you object to whatever was left of the plea

16    agreement, after you've dismissed all the other charges,

17    your objection is noted.

18         MS. RADA-HERRALD:  Thank you, Your Honor.

19         THE COURT:  96 months, of course, is eight years.

20    I think I may have said nine years.

21         I'll say this to you only because there are a lot of

22    family and other people here.  We impose sentences in

23    federal court by months and sometimes I have defendants walk

24    out of here trying to do the division and they make

25    mistakes, as I just did, and say the wrong amount of years.

1    Here it is eight years.  The mandatory sentence for this

2    offense is five years.

3        I've long held the personal view that once you get past

4    seven years, I'm not sure how much more you get by way of

5    deterrence or rehabilitation or most of the other goals, but

6    you do get the additional time of protection of the public.

7    This is a very despicable crime and a very sad day for these

8    families.

9        Mr. Putillion, you're remanded to the custody of the

10   marshal for delivery to the Bureau of Prisons for the

11   service of your sentence.

12       Court's adjourned.

13

14       (Proceedings concluded at 4:00 p.m., May 22, 2019.)

15

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATION:

2         I, Kimberly Kaufman, Official Court Reporter, certify

3    that the foregoing is a correct transcript from the record

4    of proceedings in the matter of United States of America,

5    Plaintiff v. Connor Anthony Putillion, Defendant, Criminal

6    Action No. 2:18-cr-00186, as reported on May 22, 2019.

7

8    s/Kimberly Kaufman, RMR, CRR, CRC          August 19, 2019

9    Kimberly Kaufman, RMR, CRR, CRC                   DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25